IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JAMES O. RUGH | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| MICHAEL J. ASTRUE, | : | |
| Commissioner of Social Security | : | NO. 07-2208 |

**REPORT AND RECOMMENDATION**

ELIZABETH T. HEY
UNITED STATES MAGISTRATE JUDGE                                    April 21, 2008

This action was brought pursuant to 42 U.S.C. § 405(g) to review the final

decision of the Commissioner of Social Security ("Commissioner"), denying Plaintiff's

claim for disability insurance benefits ("DIB") under Title II of the Social Security Act.

For the reasons that follow, I find that the Commissioner's final decision does not contain

substantial evidence to support the findings of fact and conclusions of law of the

Administrative Law Judge ("A.L.J."). Therefore, I recommend that the case be remanded

to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g), for further

proceedings.

I.      **PROCEDURAL HISTORY**

James D. Rugh ("Plaintiff") protectively filed for DIB on April 13, 2004, alleging

disability as of April 5, 2001, because of lumbar spine problems, cervical radiculopathy,

and depression.[1]  (Tr. 16, 92).  The application was denied initially on September 22,

2004, after which Plaintiff requested an administrative hearing.  (Tr. 26-29, 30).

On September 28, 2005, an A.L.J. held a hearing to consider the matter de novo.

(Tr. 482-530).  In a decision dated January 27, 2006, the A.L.J. denied Plaintiff's claims,

finding that Plaintiff could perform a significant range of light work as defined in 20

C.F.R. § 404.1567.  (Tr. 16-23).  On April 12, 2007, the Appeals Council denied

Plaintiff's request for review.  (Tr. 5-8).  Therefore, the decision of the A.L.J. is the final

decision of the Commissioner.  20 C.F.R. § 404.981.

Plaintiff filed the present action on May 31, 2007, and submitted his Brief and

Statement of Issues in Support of Request for Review on September 6, 2007.  Defendant

filed his Response to Request for Review on October 2, 2007, and on October 15, 2007,

Plaintiff filed a reply brief.  The case is now ripe for disposition.

## II.   **Legal Standard**

The court's role on judicial review is to determine whether the Commissioner's

decision is supported by substantial evidence.  42 U.S.C. §§ 405(g), 1383(c)(3);

Richardson v. Perales, 402 U.S. 389 (1971); Hartranft v. Apfel, 181 F.3d 358, 360 (3d

Cir. 1999).  Therefore, the issue in this case is whether there is substantial evidence to

---

[1]Plaintiff had previously filed for both DIB and supplemental security income.  His earlier applications were denied and he did not appeal.  (Tr. 16).  His current application is for DIB only.  (Tr. 487).  Plaintiff's insured status for purposes of DIB expired on December 31, 2001.  (Tr. 17, 50).  Therefore, in order to be eligible for DIB, Plaintiff is required to show that he became disabled on or before December 31, 2001.  See 42 U.S.C. § 423(a), (c); 20 C.F.R. § 404.101.

support the Commissioner's conclusion that Plaintiff is not disabled.  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate," and must be "more than a mere scintilla."  Burnett v. Apfel, 220 F.3d 112, 118 (3d Cir. 2000) (quoting Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999)).  The court has plenary review of legal issues.  Schaudeck v. Commissioner of Social Security, 181 F.3d 429, 431 (3d Cir. 1999) (citing 42 U.S.C. § 405(g)).

To prove disability, a plaintiff must demonstrate that there is some "medically determinable basis for an impairment that prevents him from engaging in any 'substantial gainful activity' for a statutory twelve-month period."  42 U.S.C. § 423(d)(1).  The Commissioner employs a five-step process in evaluating each case, determining:

1.      Whether the plaintiff is currently engaged in substantial gainful activity;

2.      If not, whether the plaintiff has a "severe impairment" that significantly limits his physical or mental ability to perform basic work activities;

3.      If so, whether, based on the medical evidence, the impairment meets the criteria of an impairment listed in the "listing of impairments," 20 C.F.R. pt. 404, subpt. P, app. 1 (1999), which results in a presumption of disability, or whether the plaintiff retains the capacity to work;

4.      If the impairment does not meet the criteria for a listed impairment, whether, despite the severe impairment, the plaintiff has the residual functional capacity to perform his past work; and

5.      If the plaintiff cannot perform his past work, then the final
step is to determine whether there is other work in the
national economy that the plaintiff can perform.

See Allen v. Barnhart, 417 F.3d 396, 401 n.2 (3d Cir. 2005) (quoting Sykes v. Apfel, 228

F.3d 259, 262-63 (3d Cir. 2000)) (internal citations omitted); see also 20 C.F.R. §

404.1520(a)(4).  The plaintiff bears the burden of proof at steps one through four, while

the burden shifts to the Commissioner at the fifth step to establish that the plaintiff is

capable of performing other jobs in the local and national economies, in light of his age,

education, work experience and residual functional capacity.  Poulos v. Commissioner of

Social Security, 474 F.3d 88, 92 (3d Cir. 2007).

## III.   FACT RECORD AND THE A.L.J.'S DECISION

Plaintiff was 43 years old at the time of his alleged onset of disability and 48 years

old at the time of the A.L.J.'s decision.  (Tr. 42, 17).  He has a general educational

development diploma ("GED") and past relevant work experience as a laborer, machine

operator, and truck driver.  (Tr. 17, 21).  Plaintiff claims to be disabled as a result of a

combination of lumbar and cervical back pain, concussion/post-concussive disorder,[2] and

depression.  (Tr. 16-19).  The A.L.J. found that Plaintiff suffered from a severe lumbar

---

[2] Post-concussive syndrome, or post-concussion syndrome, commonly follows a significant concussion with symptoms including headache, dizziness, fatigue, difficulty concentrating, variable amnesia, depression, apathy, and anxiety.  Symptoms usually resolve spontaneously over weeks to months.  The Merck Manual of Diagnosis and Therapy, 18th ed. (2006) ("Merck Manual"), at 2575.

spine impairment and a severe cervical spine impairment, but that his other impairments were not severe.  (Tr. 18-19).[3]

In his testimony, Plaintiff indicated that he has experienced a variety of symptoms following a motor vehicle accident on April 5, 2001.  (Tr. 490, 495-501).  Specifically, he claims to have suffered from post-concussive disorder as evidenced by ongoing tinnitus,[4] headaches, memory and concentration problems, dizziness, and nausea.  (Tr. 289-91, 496-98).  Following the accident, Michael Collins, D.C., a chiropractor, diagnosed Plaintiff with a mild concussion and cephalgia[5] and referred him for treatment with Bruce Grossinger, D.O., a neurologist.[6]  (Tr. 137).  On May 8, 2001, Plaintiff first saw Steven Grossinger, D.O., a neurologist in practice with Dr. Bruce Grossinger.  Dr. Steven Grossinger noted Plaintiff's complaints of headache, dizziness, pain in his neck, tinnitus, poor appetite and low back pain, and diagnosed Plaintiff with a concussion.  (Tr. 289). On October 9, 2001, Dr. Steven Grossinger noted that Plaintiff reported experiencing headaches three to four times per month, concluded that Plaintiff suffered from post-

---

[3]The A.L.J. rejected Plaintiff's claim of disability based on depression, finding a lack of objective medical evidence to support such diagnosis and therefore that it was not severe. (Tr. 18-19).  Plaintiff does not challenge this determination on appeal and therefore I do not discuss it in this report.

[4]Tinnitus is a noise in the ears, such as ringing, buzzing, roaring, or clicking.  Dorland's Illustrated Medical Dictionary, 31st ed. (2007) ("DIMD"), at 1956.

[5]Cephalgia is a headache.  DIMD, supra n.4, at 335.

[6]I note that evidence from a chiropractor, who is not considered to be an "acceptable medical source," may not be used to establish the existence of a medically determinable impairment.  See 20 C.F.R. §§ 404.1513(a) and (d).   Thus, Dr. Collins' diagnosis is not binding on the Commissioner.

traumatic headache following the accident, and recommended a new course of pain management treatment. (Tr. 281). Plaintiff's pain management specialist, Peter Schatzberg, D.C., a chiropractor, subsequently noted Plaintiff's complaints of ringing in his ears, nausea, light-headedness, and persistent headaches. (Tr. 216-34, 251, 256, 260).

It appears that Plaintiff was first seen by Dr. Bruce Grossinger in November of 2001, at which time, based on Plaintiff's symptomatology, Dr. Grossinger concluded that he suffered a concussion syndrome with memory loss and post-traumatic headaches. (Tr. 275). Dr. Bruce Grossinger referred Plaintiff to Glen Greenberg, Ph.D., for a neuropsychological evaluation in order to assess his cognitive functioning. (Tr. 177). On November 30 and December 7, 2001, Dr. Greenberg evaluated Plaintiff's general ability, academic skills, memory, executive functions, language, visual ability, motor and sensory capacity, and psychological state. (Tr. 177-83). He found that although Plaintiff worked throughout the assessment with a high degree of pain likely to interfere with his cognitive efficiency, he still operated within average levels on all tests and did not show signs of impaired brain functioning. (Tr. 183-84). Frederick Burton, M.D., also saw Plaintiff several times in November and December of 2001, and similarly noted that Plaintiff's neurological examination suggested post-traumatic cephalgia. (Tr. 188-89).

The doctors with whom Plaintiff continued treatment after his date of last insured on December 31, 2001, continued to document his complaints of symptoms consistent with post-concussive disorder. Dr. Schatzberg and Raymond Wisdo, D.C., repeatedly

diagnosed a closed head injury and headache syndrome between March of 2002 and January 2003.  (Tr. 235-46).  Dr. Steven Grossinger noted "ongoing evidence of post-concussive syndrome with headaches and tinnitus" in Plaintiff's visits with him in 2002 and 2003.  (Tr. 263-73).  Dr. Schatzberg often noted Plaintiff's subjective complaints of constant headaches in their frequent visits in 2002.  (Tr. 190-215).  Dr. Burton noted Plaintiff's complaints of persistent migraine headaches and tinnitus in visits from 2002 through 2004.  (Tr. 315-36).

Plaintiff also alleged that he had severe lumbar spine problems.  On April 5, 2001—the day of the accident—Dr. Collins reported tenderness and spasm throughout Plaintiff's lumbar spine region.  (Tr. 156).  In June 2001, an MRI of Plaintiff's lumbar spine revealed annular tears[7] at L1-L2 and both annular tears and a minimal bulging annulus  at L2-L3.  There was also reported evidence of very mild facet joint arthropathy[9][8] and of disc desiccation[10] at L4-L5, L1-L2, and L2-L3.  (Tr. 99).  The MRI further

---

[7] An annular tear is a small tear in the outer layer of fibrous tissue surrounding the gel-like center of the discs separating one's vertebrae.  See www.bhpw.com/conditions/better_health_annular.html (last visited March 28, 2008).

[8] Usually caused by tears in the annulus, a bulging annulus refers to the relaxation of the fibers of the annulus resulting in a bulging of the disc separating the vertebrae.  See http://books.google.com/books?id=-NRok9akKp8C&pg=PA413&lpg=PA413&dg=%22bulging+annulus%22%source=web&pts=4Cmlt-h7W8&sig=-CtjqNEsAFcvYcGu87yzL6SdO5w&hl=en#PPA413,M1 (last visited March 28, 2008).

[9] Arthropathy is defined as joint disease. DIMD, supra n.4, at 160.

[10] Disc desiccation is abnormal dryness of the intervertebral discs and is the earliest visible sign of disc degeneration.  See http://www.orthopedicquestions.com/back/9.html (last visited March 28, 2008).

suggested mild multilevel degenerative disc disease evidenced by small anterior spurs

from L1-L2 through L4-L5.  (Tr. 102).

In May 2001, Dr. Steven Grossinger found a reduced lumbar range of motion with

forward flexion.  (Tr. 289).  Later, in November 2001, he conducted an EMG[11] and nerve

conduction study, which were negative.  Upon examination, however, Dr. Grossinger

once again found Plaintiff's lumbar range of motion to be restricted.  (Tr. 277).  These

findings were consistent with Plaintiff's complaints of pain through 2001.  (Tr. 273-75).

In November 2001, Dr. Burton noted a full range of motion in Plaintiff's lumbar

region, but found chronic intervertebral disc syndrome[12] of the lumbosacral spine with

radiculopathy.[13]  (Tr. 189).  Dr. Burton's diagnosis and Plaintiff's corresponding

complaints of pain remained unchanged through several visits from November 2001

through early 2002.

Dr. Schatzberg also noted Plaintiff's continued complaints of constant lower back

pain and reduced range of motion through several meetings between October and

---

[11]Electromyography is an electrodiagnostic technique for recording the extracellular activity (action potentials and evoked potentials) of skeletal muscles at rest, during voluntary contractions, and during electrical stimulation; performed using any variety of surface electrodes, needle electrodes, and devices for amplifying, transmitting, and recording the signals. DIMD, supra n.4, at 609.

[12] Intervertebral disc syndrome is a general term referring to a number of problems associated with the intervertebral disc, including disc herniation, annular tears, annular bulge, sciatica, etc.  See http://www.westside4health.com/pdf/IVD.pdf (last visited March 28, 2008).

[13] Radiculopathy is a disease of the nerve roots.  DIMD, supra n.4, at 1404.

December 2001.  (Tr. 216-34; 252, 257, 260-61).  Accordingly, he diagnosed lumbar disc syndrome and lumbosacral radiculopathy.  (Tr. 252, 257, 260-61).

Plaintiff further alleged disability based on serious cervical spine problems.  X-rays taken of the cervical and thoracic spine in April 2001 revealed mild spondylosis [4][1] and facet arthrosis.[15]  (Tr. 98).  In April 2001, Dr. Collins noted a decreased range of motion in and spasms throughout the cervical spine region.  (Tr. 155-56).  On April 23, 2001, he diagnosed a cervical sprain and referred Plaintiff to Dr. Steven Grossinger for evaluation.  (Tr. 137).

In May 2001, Dr. Steven Grossinger conducted a neurologic examination and found that Plaintiff's cervical range of motion was restricted, with rotation to the right greater than left.  (Tr. 289).  The doctor also noted muscle spasm extending along the left lateral aspect of the neck and diagnosed cervical sprain with possible radiculopathy.  (Tr. 282, 289).  Accordingly, in June 2001, Dr. Grossinger performed an EMG[16] of Plaintiff's cervical spine and found the results to be abnormal with evidence of mild radiculopathy at C6.  (Tr. 285).  He also found that Plaintiff was suffering from muscle spasms and mild distortion of sensation in the left arm.  (Tr. 282).  Following the EMG, the doctor noted

---

[14] Spondylosis is a general term for degenerative changes due to osteoarthritis.  DIMD, supra n.4, at 1564.

[15] See supra n.9.

[16]An electromyogram is an electrodiagnostic technique for recording the extracellular activity (action potentials and evoked potentials) of skeletal muscles at rest, during voluntary contractions, and during electrical stimulation; performed using any of a variety of surface electrodes, needle electrodes, and devices for amplifying, transmitting, and recording the signals. DIMD, supra n.4, at 608.

that Plaintiff continued to demonstrate remarkable restriction in cervical spine range of motion and recommended Plaintiff continue treatment with his chiropractors.  (Tr. 282).

In November 2001, Dr. Burton also found decreased range of motion in the cervical spine with moderate spasm and spinous process tenderness at C2-C7.  (Tr. 188).  Accordingly, Dr. Burton diagnosed chronic intervertebral disc syndrome in the cervical spine.  (Tr. 189).

The A.L.J. found through her review of the objective medical evidence, Plaintiff's testimony, and the testimony of a Vocational Expert ("VE"), that Plaintiff retained the capacity for work existing in significant numbers in the national economy and was not under a "disability" as defined in the Social Security Act at any time through the date last insured.  The A.L.J. followed the five-step sequential analysis, and found as follows at each step:

> 1.  At step one, the A.L.J. found that Plaintiff had not performed any substantial gainful activity from the alleged onset of disability through December 31, 2001.  (Tr. 22).
>
> 2.  At step two, the A.L.J. found that Plaintiff suffered from the following severe impairments:  cervical and lumbar spine conditions.  (Tr. 22).
>
> 3.  At step three, the A.L.J. found that Plaintiff's impairments, alone or in combination, did not meet any of the listed impairments in 20 C.F.R. Pt. 404, Subpt. P, App. 1.  (Tr. 22).
>
> 4.  At step four, the A.L.J. found that Plaintiff's residual functional capacity was limited to lifting, carrying, pushing, and pulling up to 20 pounds at a time, walking or standing for up to six hours per workday, and sitting for up to six hours per workday.  Therefore, Plaintiff was unable to perform any of his past relevant work.  (Tr.  22).

5.  At step five, the A.L.J. enlisted the assistance of a VE.  In response to hypothetical questions posed by the A.L.J., the VE testified that Plaintiff could perform jobs as gate attendant and a self-service cashier.  (Tr. 23).  The A.L.J. also found, based on the VE's testimony, that these jobs existed in significant numbers in the local and national economies.  (Tr. 23).  The A.L.J. concluded on this basis that Plaintiff was not disabled at any time through December 31, 2001.  (Tr. 23).

In his Request for Review, Plaintiff argues that the decision of the A.L.J. is not supported by substantial evidence because the A.L.J. (1) failed to determine that Plaintiff's post-concussive syndrome is a severe impairment, (2) failed to properly credit the testimony of Plaintiff's treating physician, Dr. Steven Grossinger, (3) failed to properly assess Plaintiff's residual functional capacity, and (4) failed to properly credit Plaintiff's testimony.  In response, Defendant argues that the decision of the A.L.J. is supported by substantial evidence.

## IV.   DISCUSSION

### A.   The A.L.J.'s Analysis of Plaintiff's Post-Concussive Disorder at Step Two

Plaintiff first argues that the opinion of the A.L.J. is not supported by substantial evidence because the A.L.J. improperly failed to find Plaintiff's post-concussive syndrome to be a severe impairment at Step Two of the sequential evaluation.  In fact, Plaintiff argues that the A.L.J. did not even address the alleged post-concussive syndrome, let alone determine its severity.

Step Two is known as the "severity regulation" because it focuses on whether the plaintiff is suffering from a severe impairment.  20 C.F.R. § 404.1520(c).  An impairment is severe if it is "of magnitude sufficient to limit significantly the individual's ability to do

11

basic work activities." <u>Santise v. Schweiker</u>, 676 F.2d 925, 927 (3d Cir. 1982); <u>see also</u>

20 C.F.R. § 404.1520(c); S.S.R. 96-3p, "Considering Allegations of Pain and Other

Symptoms in Determining Whether a Medically Determinable Impairment is Severe."

Basic work activities are defined in the regulations as "the abilities and aptitudes

necessary to do most jobs."  20 C.F.R. § 404.1521(b).  A non-severe impairment is a

"slight" abnormality which has a minimal effect on the individual such that it would not

be expected to interfere with the individual's ability to work, irrespective of age,

education or work experience.  <u>Bowen v. Yuckert</u>, 482 U.S. 137, 149-51 (1987).

Step Two is not aimed at potentially viable claims.  Rather, it is intended to weed

out obviously invalid claims, which explains why impairments causing even minimal

effects qualify as severe and allow for further sequential scrutiny.  As the Third Circuit

has stated, "[t]he step-two inquiry is a <i>de minimis</i> screening device to dispose of

groundless claims."  <u>Newell v. Commissioner of Social Security</u>, 347 F.3d 541, 546-47

(3d Cir. 2004).

In assessing the severity of a plaintiff's alleged disability, the A.L.J. must consider

"all your symptoms, including pain, and the extent to which your symptoms can

reasonably be accepted as consistent with the objective medical evidence and other

evidence."  20 C.F.R. § 404.1529(a).  "Objective medical evidence" refers to "medical

signs and laboratory findings defined in 20 C.F.R. § 404.1528(b) and (c)."  <u>Id.</u>  "Medical

signs" are "anatomical, physiological, or psychological abnormalities which can be

observed, apart from . . . symptoms . . . [and] must be shown by medically acceptable

clinical diagnostic techniques."  Id. at § 404.1528(b).  "Laboratory findings are

anatomical, physiological, or psychological phenomena which can be shown by the use of

medically acceptable laboratory diagnostic techniques . . . ."  Id. at 404.1528(c).

With respect to concussions, at least two courts within the Third Circuit have

found the absence of objective medical evidence to be significant.  In Esh-Sheikh v.

Bowen, the court affirmed the A.L.J.'s determination that a plaintiff's complaints of

constant headaches were not supported by objective medical evidence because, despite

some evidence of a concussion, a cat scan was normal.  No. 88-2003, 1989 WL 281946,

at *16 (D.N.J. October 25, 1989).  Similarly, in Snow v. Apfel, the court affirmed the

A.L.J.'s determination that, standing alone, the plaintiff's "firsthand and repeated

statements of her own medical condition" were inadequate to substantiate her claimed

history of concussions.  No. Civ. A. 99-602-RRM, 2000 WL 33340965, at *5 (D.Del.

December 7, 2000).

Here, the A.L.J. stated the following regarding the concussion and post-concussive

syndrome symptoms of which Plaintiff complained:

> After a motor vehicle accident on the alleged onset date, [Plaintiff] told
> physicians, chiropractors, and a psychologist that he began experiencing
> chronic headaches, dizziness, nausea, lightheadedness, tinnitus, memory
> loss, irritability, and depression.  Between May and November 2001, Dr.
> Grossinger, a board-certified neurologist, found a clinically normal
> neurological status except for one observation of memory and word-finding
> deficits.  He diagnosed a concussion and referred [Plaintiff] for testing. . . .
> On  November 30 and December 7, 2001, Dr. Greenberg, a psychologist,

> performed extensive neuropsychological testing.  The results showed
> [Plaintiff] to be functioning in the average cognitive range without any
> significant deficits. . . . If [Plaintiff] did actually suffer a concussion, it did
> not cause substantiated physiological or psychological sequelae of any
> consequence.

(Tr. 18).

As previously explained, in order to be entitled to DIB, Plaintiff is required to

show that he was disabled between his alleged onset date of April 5, 2001, and December

31, 2001, his date last insured.  See 42 U.S.C. § 423(a), (c); 20 C.F.R. § 404.101.  During

that time period and thereafter, however, the only evidence of a concussion or post-

concussive syndrome in the medical records consists of Plaintiff's subjective complaints

of a variety of symptoms and the physicians' diagnoses based on those complaints.

Plaintiff does not point to, nor does the record reveal any, objective medical evidence that

would substantiate his claims that he suffered concussion or post-concussive syndrome.

Diagnosis of concussion and post-concussive syndrome typically involves a rapid

initial neurologic assessment followed by a complete neurologic examination when a

patient is stable.  See Merck Manual, supra n. 2, at 2576.  CT[17] and MRI[18] may help

confirm the results of an evaluation for this type of injury.  See id.  The record does not

reflect that Plaintiff underwent any neurologic assessment until months after the accident,

---

[17]Computed Tomography is an X-ray technique that produces images of your body that visualize internal structures in cross section rather than the overlapping images typically produced by conventional X-ray exams.  See http://www.mayoclinic.com/health/ct-scan/FL0065 (last visited April 15, 2008).

[18]Magnetic Resonance Imaging uses magnetic signals to create image "slices" of the human body.  See http:orthopedics.about.com/cs/sportsmedicine/g/mri.htm (last visited April 15, 2008).

and no CT or MRI imaging was ever done.  Indeed, the only references to any objective

medical evidence are to the results of a neuropsychological evaluation by Dr. Greenberg

and some memory and word-finding deficits found by Dr. Bruce Grossinger, both over

seven months after the accident.  However, neither doctors' findings are adequate to

substantiate Plaintiff's claim of a post-concussive disorder.

Plaintiff was seen by neurologist Dr. Steven Grossinger on May 8, 2001, and

complained of headache and dizziness, but no impairments were noted and no tests were

ordered with respect to these symptoms.  (Tr. 289).  On October 9, 2001, Plaintiff

reported headaches "about 3-4 times per month, since the accident" to Dr. Steven

Grossinger, who diagnosed "posttraumatic headache," but noted no other neurological

abnormalities and conducted no tests.  (Tr. 281).  In Dr. Greenberg's evaluations on

November 30, and December 7, 2001, the doctor found that although Plaintiff worked

through the evaluation with a high degree of pain likely to interfere with cognitive

efficiency, his test performance was still within average ranges.  (Tr. 183-84).  In a letter

dated November 16, 2001, neurologist Dr. Bruce Grossinger reported that Plaintiff "has

impairment of recent and remote memory as well as some word finding errors" consistent

with Plaintiff's complaints, and he diagnosed "concussion syndrome with memory loss

and post-traumatic headaches."  (Tr. 275).  Such minimal findings simply do not

substantiate Plaintiff's claim of a severe impairment.[19]

---

[19]It is of some interest that in March 2000, after a work-related fall, Plaintiff reported a
history of headaches and dizziness, whereas in reporting symptoms after the April 5, 2001,
accident, Plaintiff did not report that he had a history of headaches or dizziness.  (Tr. 174, 163).

Although the record suggests that Plaintiff experienced symptoms consistent with a post-concussive syndrome, there is insufficient objective medical evidence to substantiate a claim that Plaintiff actually suffered a concussion or that, if he did, it caused a post-concussive disorder that had anything more than a minimal effect on his ability to work prior to his date last insured of December 31, 2001. As a result, I find substantial evidence exists to support the A.L.J.'s determination that Plaintiff's post-concussive syndrome was not a severe condition during the closed period in question. See Bowen, 482 U.S. at 149-51.

### B.    Weight Given to the Opinions of the Primary Care Physician

Plaintiff next argues that the opinion of the A.L.J. is not supported by substantial evidence because the A.L.J. erroneously failed to give controlling weight to the medical opinions of Dr. Steven Grossinger, Plaintiff's treating neurologist. Under the Commissioner's regulations, the opinions of a treating source are entitled to controlling weight where the physician's opinion on the issues of the nature and severity of a plaintiff's impairment "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in" the record. 20 C.F.R. § 404.1527(d)(2).[20]   Even if a treating source's opinion is not given controlling weight, the A.L.J. must consider certain factors in determining the weight to give the opinion, and must explain the reasons for the weight given. Id.  (factors include

---

[20]A treating source is "your own physician, psychologist, or other acceptable medical source who provides you or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you." 20 C.F.R. § 404.1502.

the length of treatment and frequency of examination, and the nature and extent of the treatment relationship).

An A.L.J. is not required to accept a treating source's opinions, but must explain her reasons for rejecting them.  Thus, as a general rule, the opinions of a treating physician have greater probative value than those of an examining physician. Podedworny v. Harris, 745 F.2d 210, 217 (3d Cir. 1984).  "Treating physicians' reports should be accorded great weight, especially 'when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.'"  Plummer, 186 F.3d at 429 (quoting Rocco v. Heckler, 826 F.2d 1348, 1350 (3d Cir. 1987)); see also S.S.R. 96-2P, "Policy Interpretation Ruling: Giving Controlling Weight to Treating Source Medical Opinions" (providing for controlling weight where treating physician opinion is well-supported by medical evidence and not inconsistent with other substantial evidence in record).  "[W]hen a conflict in the evidence exists, the A.L.J. may choose who to credit but 'cannot reject evidence for no reason or for the wrong reason.'"  Plummer, 186 F.3d at 429 (quoting Mason v. Shalala, 994 F.2d 1058, 1066 (3d Cir. 1993)).  Therefore, "[a]n A.L.J. may reject a treating physician's opinion outright only on the basis of contradictory medical evidence, but may afford a treating physician's opinion more or less weight depending upon the extent to which supporting explanations are provided."  Id. (citing Newhouse v. Heckler, 753 F.2d 283, 286 (3d Cir. 1984)).

17

The A.L.J. acknowledged that her determination of Plaintiff's residual functional capacity as of December 31, 2001, was not consistent with some of the medical opinions in the record.  The A.L.J. explained her rejection of those opinions:

> I am aware of October, November, and December 2001 statements from Dr. Schatzberg that [Plaintiff] was disabled. [Tr. 251-53, 256-61].  As stated above, a chiropractor is not an acceptable medical source.  Furthermore, his bald assertions of disability are not supported by the medical evidence and are not binding upon me. . . .   In May 2001, Dr. [Steven] Grossinger believed that [Plaintiff] could not do his past relevant work.  In October 2001, he felt that he could return to work only on a part-time basis lifting ten pounds. [Tr. 289-90, 280].  With all due respect to Dr. Grossinger, his medical findings do not warrant a restriction to part-time employment, and I will not give this opinion great weight. . . .

(Tr. 20).  The question is whether the A.L.J. had sufficient reason to reject Dr. Grossinger's opinions.

Plaintiff was first seen by Dr. Steven Grossinger in May 2001, and his records document follow-up neurological examinations in June, October, and November, 2001. (Tr. 289-90, 282-84, 277-79).  His associate, Dr. Bruce Grossinger, also evaluated Plaintiff in November 2001.  (Tr. 275).  These records demonstrate that these neurologists were working in conjunction with Plaintiff's treating chiropractors and were involved in recommending and prescribing treatment to control Plaintiff's pain.  This qualifies them as treating physicians within the meaning of the regulations.  Given the doctors' documentation over a six-month period of Plaintiff's cervical and lumbar pain and limitations of motion, I find that the dismissive, single-sentence rejection by the A.L.J. of

18

Dr. Steven Grossinger's opinion of Plaintiff's ability to work is not supported by

substantial evidence, particularly in view of the other record evidence.

At Plaintiff's first visit in May 2001, Dr. Steven Grossinger noted that Plaintiff had

a restricted cervical range of motion with muscle spasms on the left lateral aspect of the

neck.  (Tr. 289).  Accordingly, Dr. Grossinger characterized Plaintiff as unfit for his prior

employment due to poor tolerance for frequent lifting and carrying.  (Tr. 290).

Following an EMG conducted on June 5, 2001, Dr. Grossinger diagnosed Plaintiff

with left C6 radiculopathy.  (Tr. 283-84).  Reporting the test results to Plaintiff's treating

chiropractor, Dr. Grossinger noted that Plaintiff "continues to be remarkable for

restriction in cervical range of motion."  He additionally noted muscle spasms and

distortion of sensation on the left side, as well as continued reduction of deep tendon

reflexes.  (Tr. 282).

At an October 2001 neurological follow-up, although he noted that treatments had

helped reduce the intensity of Plaintiff's pain, Dr. Grossinger diagnosed cervical

radiculopathy and strain and lumbar strain.  (Tr. 281).  Accordingly, he restricted Plaintiff

to working four to six hours per day; some simple grasping and fine manipulation but no

pushing or pulling with right hand; no repetitive action with the left hand; lifting and

carrying up to ten pounds and pushing and pulling from eleven to twenty pounds; limited

prolonged standing, walking sitting, and operation of mobile equipment; and no bending,

stopping, knelling, squatting, twisting, or climbing.  (Tr. 280).  Dr. Grossinger made

similar findings of cervical and lumbar strain on November 2, 2001.  (Tr. 277).   During

this period, Dr. Burton also found significantly reduced range of motion in the cervical

spine and prescribed Vicodin[21] for the treatment of Plaintiff's pain.  (Tr. 186-89).[22]

Consistent with these findings, Dr. Grossinger also recommended that Plaintiff

continue his course of treatment with chiropractor Dr. Schatzberg, whose extensive

treatment notes through the period of disability lend support to Dr. Grossinger's

conclusions.  (Tr. 277, 216-34).  Here, the A.L.J. dismissed Dr. Schatzberg's notes,

finding that he is not an "acceptable medical source" and that his conclusions are not

consistent with the medical record.  (Tr. 20).  However, although Dr. Schatzberg's

opinion cannot be used as a basis for diagnosis, see S.S.R. 06-03p; 20 C.F.R. §

404.1513(a), his treatment notes can be used to provide insight into the severity of

Plaintiff's impairments and how they affect his ability to function.  S.S.R. 06-03p; 20

C.F.R. § 404.1513(d).  Also, Dr. Schatzberg's observations support the conclusion of Dr.

Grossinger, Plaintiff's treating neurologist.  The A.L.J.'s failure to consider Dr.

Grossinger's opinion as supported by Dr. Schatzberg was in error.

In considering the medical opinion of Dr. Grossinger, the A.L.J. was required to

consider the length of the treatment relationship, the frequency of examination, and the

---

[21] Vicodin is indicated "for the relief of moderate to moderately severe pain."
Physician's Desk Reference, 61st ed. (2007), at 526.

[22]The Grossingers continued to evaluate Plaintiff after December 2001, but as those
records are outside the relevant time period, it was not error to exclude them from the A.L.J.'s
consideration.

nature and extent of the treatment relationship, and to give good reasons for the weight given to his opinion.  20 C.F.R. § 404.1527(d).  She did not address any of those considerations in weighing Dr. Grossinger's findings and failed to give any reasons for not doing so.  The A.L.J.'s only reason for rejecting Dr. Grossinger's opinions was her observation that "his medical findings do not warrant a restriction to part-time employment."  (Tr. 20).  Given Dr. Grossinger's expertise as a neurologist, his documentation of Plaintiff's conditions and pain over a six-month period, and the consistency of his opinion with the record, the A.L.J.'s off-handed rejection of Dr. Grossinger's opinion is inadequate.

In sum, I conclude that the A.L.J. failed to properly weigh the medical opinions of record.  Therefore, I find that this aspect of the A.L.J.'s opinion is not supported by substantial evidence and recommend that the case be remanded for further consideration.

### C.  Failure to Credit Plaintiff's Testimony

Plaintiff next argues that the A.L.J. failed to properly consider his testimony and subjective complaints regarding his limitations.  Plaintiff argues that the conditions of which he complains and which were documented by his medical care providers could reasonably produce the disabling limitations he alleges.  A plaintiff's testimony regarding his inability to perform work related activities and with regard to pain and other symptoms is entitled to great weight.  See Green v. Schweiker, 749 F.2d 1066 (3d Cir. 1985); Dobrowolsky v. Califano, 606 F.2d 403, 409 (3d Cir. 1979).  However, an A.L.J.

may reject complaints of pain and other symptoms if she affirmatively addresses the claim in her decision, specifies her reasons for rejecting it, and has support for her conclusion in the record.  Matullo v. Bowen, 926 F.2d 240, 245 (3d Cir. 1990) (citing Baerga v. Richardson, 500 F.2d 309, 312 (3d Cir. 1974), cert. denied, 420 U.S. 931 (1975)).

Because of the necessary interplay between the treating neurologist's findings and Plaintiff's subjective complaints, it is not possible to address the adequacy of the A.L.J.'s assessment of Plaintiff's testimony at this time.  As discussed above, Dr. Grossinger's records through the date last insured indicate the presence of a variety of problems in Plaintiff's lumbar and cervical spine.  The doctor's findings, if credited, are consistent with and could reasonably produce the pain and symptoms of which Plaintiff complained at his administrative hearing.  Thus, a more thorough consideration of the treating physician's records on remand could very well lead to a different conclusion as to Plaintiff's subjective complaints.  Because the medical evidence supporting Plaintiff's impairments and pain are necessary to evaluate his credibility, see Dobrowolsky, 606 F.2d at 409, proper consideration of Dr. Grossinger's findings may affect the weight given to Plaintiff's testimony on remand.

### D. The A.L.J.'s Residual Functional Capacity Assessment

Plaintiff also argues that the A.L.J. erroneously assessed his residual functional capacity ("R.F.C.").  Plaintiff argues that the A.L.J. failed to adequately consider his

inability to work an eight hour day, use his left arm extensively, and to concentrate and focus.  He also argues that the A.L.J. posed a flawed hypothetical to the vocational expert.

"Residual functional capacity is defined as that which an individual is still able to do despite the limitations caused by his or her impairments."  Burnett, 220 F.3d at 121. The R.F.C. assessment is based upon all of the relevant evidence of an individual's work-related activities, including his or her medically determinable impairments or combination of impairments, and the impact of any related symptoms.  See S.S.R. 96-8p, "Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims."  Moreover, the A.L.J. must consider all of the plaintiff's conditions revealed by the record, in combination, regardless of their severity.  See Burnett, 220 F.3d at 122; 20 C.F.R. § 404.1545.

Given the A.L.J.'s failure to address adequately the medical findings of Dr. Grossinger discussed above  --  and consistent with my conclusion that remand may require a re-evaluation of Plaintiff's subjective complaints -- I similarly find it unnecessary to address the A.L.J.'s R.F.C. finding at this time.  Obviously, the A.L.J.'s further consideration of the treating physician's records on remand, together with Plaintiff's subjective complaints, could change the A.L.J.'s R.F.C. determination.

## V.  CONCLUSION

In assessing the findings of Plaintiff's treating physician, Dr. Grossinger, the A.L.J. failed to give any explanation for the little weight she assigned to his conclusions.

Dr. Grossinger examined Plaintiff several times during the period of disability through and beyond the date of last insured.  At each examination, he not only documented Plaintiff's subjective complaints of pain, but found that Plaintiff had significant limitation of motion throughout his lumbar and cervical spine that limited his ability to work. Moreover, Dr. Grossinger's findings are substantiated by the chiropractors' extensive treatment notes through the disability period as well as by the findings of Dr. Burton. Additionally, proper consideration of this medical evidence is crucial to determining Plaintiff's credibility and residual functional capacity.  Thus, I recommend remanding the case for further consideration.

Therefore, I make the following:

## **R E C O M M E N D A T I O N**

AND NOW, this 21st          day of      April                 , 2008, it is

RESPECTFULLY RECOMMENDED that the case be remanded to the Commissioner

pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with

this Report, Judgment be entered REVERSING the decision of the Commissioner of

Social Security for the purposes of this remand only, and the relief sought by Plaintiff be

GRANTED to the extent that the matter be REMANDED for further proceedings

consistent with this adjudication.  The Parties may file objections to this Report and

Recommendation.  <u>See</u> Local Civ. Rule 72.1.  Failure to file timely objections may

constitute a waiver of any appellate rights.


/s/Elizabeth T. Hey


_____

ELIZABETH T. HEY
UNITED STATES MAGISTRATE JUDGE


25